R.B., *an infant*, *by her mother and natural guardian, Blimy Braver*, and BLIMY BRAVER, *individually*,

          Plaintiff,

- versus -

UNITED STATES OF AMERICA,

          Defendant.

MEMORANDUM AND ORDER
11-CV-761

APPEARANCES:

    LAW OFFICES OF DAVID B. GOLOMB
        370 Lexington Avenue, Suite 908
        New York, New York 10017
    By:    David B. Golomb
        *Attorney for Plaintiffs*

    LORETTA E. LYNCH
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, New York 11201
    By:    Ameet B. Kabrawala
        *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        R.B., by her mother and natural guardian Blimy Braver, and Blimy Braver (collectively, "plaintiffs") commenced this medical malpractice action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2401, 2671-2680. The government moves to dismiss the complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(h)(3). I heard oral argument on this motion on May 10, 2013. For the reasons stated below, the government's motion to dismiss is denied.

BACKGROUND

A. *The Birth of R.B.*

R.B. was born to her mother, Blimy Braver, on July 26, 2007, at Beth Israel Medical Center ("Beth Israel"). Compl. ¶ 19, ECF No. 1; Answer ¶ 19, ECF No. 8. She was delivered by, among others, Dr. Alex S. Tepper.[1] Compl. ¶ 26; Answer ¶ 26. Dr. Tepper was among the obstetricians who provided prenatal services to Braver at ODA Primary Care Health Center ("ODA"), a federally-supported health clinic. Compl. ¶¶ 11-12, 16-17; Answer ¶¶ 11-12, 16-17. Dr. Tepper also maintained delivery privileges at Beth Israel. Compl. ¶ 9; Answer ¶ 9.

Immediately upon delivery, Dr. Tepper observed that R.B.'s arm was flaccid and recognized that she had suffered a brachial plexus injury (also known as Erb's Palsy).[2] Kabrawala Decl., Ex. B., at 67 (Tepper Dep.)[3]; Blimy Braver Decl. ¶¶ 10-11. Following delivery, while Braver was still in the delivery room, Dr. Tepper informed her that the delivery was "tough" as R.B. had gotten "stuck" due to her shoulders and the umbilical cord was around her neck. Kabrawala Decl., Ex. A, at 132 (Braver Dep.); Blimy Braver Decl. ¶ 12.

R.B. was transferred to the neonatal intensive care unit ("NICU") following her birth. Kabrawala Decl., Ex. C, at BIMC_RB 000000017-18 (Beth Israel Progress Notes).

---

[1] Plaintiffs dispute that anyone other than Dr. Tepper delivered R.B. Pls.' Mem. in Opp'n Mot. Dismiss 3 n.1, ECF No. 30. In support of this argument, they cite to Dr. Tepper's deposition, where he states that he was the only person to physically touch R.B. "from the moment of crowning to the moment of complete delivery." Golomb Decl., Ex. G, at 245 (Tepper Dep.). This fact is not material to the issue of subject matter jurisdiction presently before the Court. However, I note that plaintiffs suggest that others were involved in the delivery of R.B. in their complaint. *See* Compl. ¶¶ 25, 31-32. I am also skeptical as to whether the physical handling of a baby "from the moment of crowning to the moment of complete delivery" is the only action involved in delivering a baby.

[2] "The brachial plexus is a network of nerves that conducts signals from the spine to the shoulder, arm, and hand. Brachial plexus injuries are caused by damage to those nerves. Symptoms may include a limp or paralyzed arm; lack of muscle control in the arm, hand, or wrist; and a lack of feeling or sensation in the arm or hand." *Brachial Plexus Injuries Information Page*, NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE, NATIONAL INSTITUTES OF HEALTH, http://www.ninds.nih.gov/disorders/brachial_plexus/brachial_plexus.htm (last visited May 7, 2013).

[3] Both parties submitted select excerpts of the depositions of Dr. Tepper and Braver as exhibits to their papers. Those excerpts do not entirely overlap with each other, which is why I do not consistently cite to the same exhibits in referencing these depositions.

Braver was informed that R.B. had been transferred to the NICU and understood that one of the reasons for the transfer was "because of the condition of her hand." Kabrawala Decl., Ex. A, at 134 (Braver Dep.). Braver was able to see R.B. in the NICU later that day; she was "shocked" to see R.B. on oxygen and with an IV. *Id*. at 135-36.

That same day, Dr. Tepper spoke again with Braver, who asked him "exactly what happened." Golomb Decl., Ex. F, at 136 (Braver Dep.). Dr. Tepper informed Braver that R.B. had shoulder dystocia[4] during the delivery, whereby her "shoulder got stuck." *Id*. at 136. He told Braver that the shoulder dystocia was "why the baby didn't come out, and the baby had the cord around the neck so we had to act quick." *Id*. Dr. Tepper expressed pleasure in the outcome and stated that he believed he had done a "good job" in delivering the baby. *Id*. at 136, 138.

On July 27, 2007 R.B. underwent an MRI and a neurological consultation with Dr. Hillary Raynes. Kabrawala Decl., Ex. C, at BIMC_RB 000000020, 36-37 (Beth Israel Progress Notes and Radiology Report). The MRI revealed "[p]ost-traumatic soft tissue swelling . . . in the right T1-T2 paraspinal[5] region as well as in the right supraclavicular and retroclavicular soft tissues." *Id*. at 000000037 (Radiology Report). It also revealed swelling, "also probably post-traumatic," in "the proximal right biceps muscle and distal right sternocleidomastoic muscle." *Id*. Finally, the MRI revealed the presence of two small pseudomeningoceles.[6] *Id*.

---

[4] Shoulder dystocia is an obstetric complication whereby a fetal shoulder becomes impacted against the pubic bone after the head has emerged during delivery. Kabrawala Decl., Ex. B, at 94 (Tepper Dep.).
[5] Paraspinal means "adjacent to the spinal column." *Paraspinal*, MERRIAM-WEBSTER, http://www.merriam-webster.com/medical/paraspinal (last visited May 7, 2013).
[6] A meningocele is "an outpouching of the meninges," which are connective tissue. A pseudomeningocele "is a meningocele or outpouching that may lack . . . each of the layers of the meninges so that . . . there may be a tear in one or more layers of the covering of the connective tissue." An MRI study with a discernible pseudomeningocele is indicative of the escape of cerebrospinal fluid ("CSF"). Kabrawala Decl., Ex. D, at 77-79 (Bello Dep.).

On July 28, 2007 Dr. Raynes discussed the MRI results with Braver, noting that R.B. may have suffered an avulsion of the nerve root[7] and escape of cerebrospinal fluid ("CSF"). Kabrawala Decl., Ex. C, at BIMC_RB 000000022 (Beth Israel Progress Notes); Kabrawala Decl., Ex. A, at 145 (Braver Dep.) (recalling Dr. Raynes stating that the MRI revealed the escape of CSF); *see also* Kabrawala Decl., Ex. C, at BIMC_RB 000000028 (Consultation Request and Report) (Dr. Raynes discussing possibility of nerve root avulsion with Braver prior to the MRI); Kabrawala Decl., Ex. A, at 144 (Braver Dep.) (recalling Dr. Raynes stating that R.B. lacked sensation and movement in her right arm prior to the MRI). Dr. Raynes' notes from that date indicated a clinical suspicion of "complete paralysis" of the right limb and avulsion of the nerve root. Kabrawala Decl., Ex. C, at BIMC_RB 000000027 (Consultation Request and Report). They further indicated that R.B. would be transferred to New York-Presbyterian Hospital[8] ("New York-Presbyterian") to undergo a neurosurgical evaluation. *Id*. Finally, the notes indicated that Braver and her husband were "aware of the severity" of the situation." *Id*.; Kabrawala Decl., Ex. A, at 145 (Braver Dep.) (recalling Dr. Raynes stating that the leaking CSF was "very dangerous" and that R.B. had to be transferred to New York-Presbyterian).

On July 29, 2007 R.B. was transferred to New York-Presbyterian for evaluation of a suspected spinal cord injury. Kabrawala Decl., Ex. E, at NYPH 000000003 (New York-Presbyterian Records). An examination revealed no movement, reflexes, or response to pain in R.B.'s right upper extremity. *Id*. at 000000004. Braver and her husband were instructed on how

---

[7] In the context of a brachial plexus injury, an avulsion signifies the tearing of the nerve from its attachment at the spinal cord. Kabrawala Decl., Ex. B, at 274 (Tepper Dep.).

[8] New York-Presbyterian is the university hospital of Columbia and Cornell. It is composed of multiple facilities, including the Columbia University Medical Center and the Weill Cornell Medical Center. R.B. appears to have been transferred to the Columbia University Medical Center, as the parties refer to the receiving hospital interchangeably as New York-Presbyterian, Columbia Presbyterian, and Columbia.

to perform physical therapy exercises on R.B. and to return with R.B. in two months. *Id*. at 000000052; Kabrawala Decl., Ex. A, at 150 (Braver Dep.).

B. *The Conversation with Dina Fisch*

In October 2007, about a week following the end of the Jewish holiday of Succoth,[9] Braver's father informed her that his brother (*i.e.*, her uncle) knew a woman, Dina Fisch, whose baby had a condition similar to R.B.'s. Blimy Braver Decl. ¶¶ 21-24. Shortly thereafter, Braver telephoned Fisch, who informed her that Fisch's daughter (who was then approximately three years old) had also suffered a brachial plexus injury during delivery. *Id*. ¶¶ 25-26; Fisch Decl. ¶ 9. Fisch informed Braver that this type of injury may be caused by the actions of the delivering physician and that she had retained counsel to sue the obstetrician who had delivered her daughter.[10] Blimy Braver Decl. ¶ 27; Fisch Decl. ¶¶ 12, 14.

C. *Procedural History*

On August 25, 2009 plaintiffs commenced a medical malpractice action against Dr. Tepper and Beth Israel in the Supreme Court of the State of New York, Kings County. Golomb Decl., Ex. B (Verified Complaint). On December 16, 2009, pursuant to 28 U.S.C. § 2679(d), the United States Attorney for the Eastern District of New York certified that Dr. Tepper was a federal employee acting within the scope of his employment at the time of the incidents alleged in the complaint, thereby deeming the action as one brought against the United States. Kabrawala Decl., Ex. F, Ex. C (Certification annexed to Notice of Removal). The United States Attorney removed the complaint on that basis to this Court on that date. Kabrawala Decl., Ex. F (Notice of Removal).

---

[9] In 2007, Succoth began on September 26, 2007 and ended on October 3, 2007. Blimy Braver Decl. ¶ 22.

[10] Fisch had retained David Golomb, and she provided Golomb's contact information to Braver, who retained him in this case. *Id*. ¶¶ 28-29; Fisch Decl. ¶¶ 6, 14.

5

On February 22, 2010, on the stipulation of the parties, the Court dismissed the complaint as to the United States without prejudice to enable plaintiffs to administratively exhaust their claims, as required by the FTCA.[11] 28 U.S.C. § 2675(a). On March 19, 2010 plaintiffs' counsel sent administrative claims to the United States Department of Health and Human Services ("HHS"). Compl., Ex. A. The claims were received by HHS, but were not resolved prior to the commencement of the present action.[12] Compl. ¶ 2; Answer ¶ 2.

On February 16, 2011 plaintiffs commenced the present action naming the United States as the sole defendant. *See* Compl. On June 17, 2011 the Government filed its Answer. *See* Answer. The parties completed discovery on November 20, 2012. *See* Minute Entry, Nov. 20, 2012. Following the completion of discovery, plaintiffs filed a letter application for a proposed motion for summary judgment and the government filed a letter application for a proposed motion to dismiss. ECF Nos. 17-18. By Order dated February 26, 2013, I granted the government leave to file its motion to dismiss. Order, Feb. 26, 2013. The government filed its motion to dismiss on March 22, 2013. I heard oral argument on the motion on May 10, 2013.[13]

---

[11] The Court remanded plaintiffs' claims against Beth Israel to state court. Gov't Mem. in Support Mot. Dismiss 5, ECF No. 21.

[12] Before instituting "a claim against the United States for money damages for injury or loss of property or personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government," a claimant must "have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing." 28 U.S.C. § 2675(a). The failure of an agency to make a final disposition on a claim within six months of its filing may, at the claimant's option, be deemed a final denial. *Id*. Plaintiffs alleged in the complaint that their administrative claims were "effectively denied by the . . . Department of Health and Human Services in that [it] ha[s] failed to make a final disposition of either claim despite the passage of more than six months since the claims were filed." Compl. ¶ 2. In its answer, the government admits that it received the administrative claims and that they were not resolved prior to the filing of the present action, but denies that this constitutes a denial. Answer ¶ 2. I do not address the issue of exhaustion as the government has not presented it in its motion to dismiss.

[13] At oral argument, the government moved, in the alternative, for a hearing on the issue of accrual. This motion lacks merit and is, in any event, procedurally defaulted, as the issue could have been explored in discovery. The government explained at oral argument that the issue was belatedly raised because new counsel was assigned this matter at some point during the discovery process.

DISCUSSION

A.  *The Standard of Review*

Fed. R. Civ. P. 12(h)(3) provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Motions brought pursuant to Fed. R. Civ. P. 12(h)(3) are subject to the same standard as motions to dismiss for lack of subject-matter jurisdiction brought pursuant to Fed. R. Civ. P. 12(b)(1), except that the former may be asserted at any time and need not be responsive to a pleading.[14] *See Greystone Bank v. Tavarez*, No. 09-CV-5192, 2010 WL 3325203, at *1 (E.D.N.Y. Aug. 19, 2010) ("Except for the pre-answer limitation on Rule 12(b)(1) motions, the distinction between a Rule 12(b)(1) motion and a Rule 12(h)(3) motion is largely academic, and the same standards are applicable to both types of motions."); *Brotman v. United States*, 111 F. Supp. 2d 418, 420 n.1 (S.D.N.Y. 2000). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The court may consider evidence outside the pleadings relevant to the jurisdictional question in deciding the motion. *Id.* (citing *Kamen v. American Telephone & Telegraph Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)); *Luckett v. Bure*, 290 F.3d 493, 496-97 (2d Cir. 2002). The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence. *Luckett*, 290 F.3d at 496-97; *Makarova*, 201 F.3d at 113 (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)).

---

[14]     The government's motion is brought pursuant to Fed. R. Civ. P. 12(h)(3), rather than Fed. R. Civ. P. 12(b)(1), because the government has answered the complaint. *See* Fed. R. Civ. P. 12(h)(3) (providing for dismissal "whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter").

B.  *The FTCA's Statute of Limitations*

The FTCA "constitutes a limited waiver by the United States of its sovereign immunity" for certain classes of torts claims. *Millares Guiraldes de Tineo v. United States*, 137 F.3d 715, 519 (2d Cir. 1998). The statute provides that the federal district courts shall have exclusive jurisdiction over damages claims against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). In order to bring a claim under the FTCA, a plaintiff must "comply with several strictly construed prerequisites to suit." *Glover v. United States*, 111 F. Supp. 2d 190, 192 (E.D.N.Y. 2000).

The prerequisite at issue here is that of timeliness. The FTCA provides, in relevant part, that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b). This limitations period is jurisdictional. *United States v. Kubrick*, 444 U.S. 111, 117-18 (1979) ("We should . . . have in mind that the [FTCA] waives the immunity of the United States and that in construing the statute of limitations, which is a condition of that waiver, we should not take it upon ourselves to extend the waiver beyond that which Congress intended."). "Unless a plaintiff complies with [the limitations period], a district court lacks subject matter jurisdiction over a plaintiff's FTCA claim." *Johnson v. Smithsonian Institution*, 189 F.3d 180, 189 (2d Cir. 1999).

C.  *Analysis*

Where an FTCA action in which the United States is substituted as a party-defendant is subsequently dismissed for failure to exhaust administrative remedies, the Court

looks to the date on which the underlying action was commenced to determine timeliness. 28 U.S.C. § 2679(d)(5). Here, plaintiffs' action was dismissed for failure to exhaust administrative remedies following the substitution of the United States as a party-defendant (and removal to this Court). Accordingly, I must look to the date on which the underlying action was commenced in state court – August 25, 2009 – to determine timeliness. The parties agree that the Court lacks subject matter jurisdiction unless plaintiffs' claim accrued on or after August 25, 2007, *i.e.* two years prior to commencing the action in state court. Gov't Mem. in Support Mot. Dismiss 9; Pls.' Mem. in Opp'n Mot. Dismiss 11.

The government contends that plaintiffs' claim accrued on the day of R.B.'s birth on July 26, 2007. Specifically, the government asserts that Braver both knew "the critical facts of R.B.'s injury at the time of birth" as well as "the critical facts surrounding its cause." Gov't Mem. in Support Mot. to Dismiss 11. Plaintiffs argue that their claims did not accrue until October 2007, when Braver "learned for the first time . . . that the injury with which R.B. had been born may have been caused by something done by Alex Tepper, M.D., the delivering obstetrician, *i.e.*, that it may have been *iatrogenic*[15]." Pls' Mem. in Opp. Mot. to Dismiss 1 (emphasis in original). As explained below, I conclude that plaintiffs' claims accrued in October 2007.

        1.    *The Accrual Date of Plaintiffs' Medical Malpractice Claim*

A medical malpractice claim under the FTCA typically accrues "at the time of injury." *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 139 (2d Cir. 2011) (quoting *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998)). But "where a plaintiff 'would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted,

---

[15] Iatrogenic refers to that which is "induced advertently by a physician or surgeon or by medical treatment or diagnostic procedures." *Iatrogenic*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/iatrogenic (last visited May 7, 2013).

the so-called 'diligence-discovery rule of accrual' applies."[16] *Id*. at 140 (quoting *Kronisch*, 150 F.3d at 121). Under the diligence-discovery rule, an FTCA claim accrues when "'with reasonable diligence,' the plaintiff 'has or . . . should have discovered the critical facts of both his injury and its cause.'" *Id*. (quoting *Barrett v. United States*, 689 F.2d 324, 327 (2d Cir. 1982)); *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 177 (2d Cir. 2008) ("[A] medical malpractice cause of action accrues under the FTCA once an injured plaintiff has notice that the cause of his injury is in the government's control . . . . The notice must be not of harm but of iatrogenic harm, though . . . not necessarily of *negligent* iatrogenic harm.") (emphasis in original) (citations and internal quotation marks omitted).

The Second Circuit has instructed that the diligence-discovery rule "is not an exacting requirement." *A.Q.C.*, 656 F.3d at 140 (quoting *Kronisch*, 150 F.3d at 121). Discovery of the "critical facts" of injury and causation requires "knowledge of, or knowledge that could lead to, the basic facts of the injury, i.e., knowledge of the injury's existence and knowledge of its cause or of the person or entity that inflicted it." *Kronisch*, 150 F.3d at 121 (quoting *Guccione v. United States*, 670 F. Supp. 527, 536 (S.D.N.Y. 1987)). A plaintiff "need not know each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim." *Id*. (quoting *Guccione*, 670 F. Supp. at 536). Rather, a claim accrues "when the plaintiff knows, or should know, enough 'to protect himself by seeking legal advice.'" *A.Q.C.*, 656 F.3d at 140 (quoting *Kronisch*, 150 F.3d at 121 (quoting *Guccione*, 670 F. Supp. at 536)).

Neither party disputes that the "critical facts" of R.B.'s injury were readily discernible shortly after her birth on July 26, 2007. Immediately upon delivery, Dr. Tepper recognized that R.B. had suffered a brachial plexus injury. Kabrawala Decl., Ex. B, at 67

---

[16] The parties agree that the "diligence-discovery rule" applies in this case. Gov't Mem. in Support Mot. to Dismiss 9; Pls' Mem. in Opp. Mot. to Dismiss 8. The only dispute is when plaintiffs' claims accrued under this rule.

10

(Tepper Dep.); Blimy Braver Decl. ¶¶ 10-11. R.B. was then transferred to the NICU and Braver understood that one of the reasons for the transfer was "because of the condition of her hand." Kabrawala Decl., Ex. A, at 134 (Braver Dep.). Dr. Tepper informed Braver that R.B. had shoulder dystocia during the delivery. Golomb Decl., Ex. F, at 136 (Braver Dep.). On July 28, 2007, two days after R.B.'s birth, Dr. Raynes informed Braver that an MRI had revealed that R.B. may have suffered an avulsion of the nerve root and escape of CSF and that R.B. needed to be transferred to another hospital for a neurosurgical consultation. Kabrawala Decl., Ex. C, at BIMC_RB 000000022 (Beth Israel Progress Notes); *id*. at 000000027 (Consultation Request and Report). In sum, shortly after R.B.'s birth, Braver was aware that R.B. had suffered a brachial plexus injury, which forms the basis of this action.

Since Braver "knew the critical facts of her daughter's injury at or near the time of her birth, any claim related to that injury accrued once [she] had reason to suspect that [her daughter's] injury was iatrogenic." *A.Q.C.*, 656 F.3d at 140 (citing *Kronisch*, 150 F.3d at 121). The government contends that Braver had such reason when she was informed of the brachial plexus injury that R.B. had suffered following her birth. Gov't Mem. in Support Mot. to Dismiss 11 ("[N]ot only did Ms. Braver know the critical facts of R.B.'s injury at the time of birth, she was also aware of the critical facts surrounding its cause.").

I find the government's position unpersuasive. None of the evidence it cites to indicate that Braver had reason to suspect that R.B.'s brachial plexus injury was attributable to actions taken by Dr. Tepper. The government points to evidence that Dr. Tepper observed, immediately upon delivery, that R.B. had suffered a brachial plexus injury; that Dr. Tepper informed Braver shortly thereafter that the delivery was "tough" and R.B. lacked movement in her right hand; that R.B. was then transferred to the NICU; and that Braver was informed that the

11

MRI revealed escape of CSF and that R.B. may require surgery. Gov't Mem. in Support Mot. Dismiss 10-11. This evidence goes to the nature of R.B.'s injury, but it fails to suggest that such injury may have been caused by actions undertaken by Dr. Tepper. In fact, Dr. Tepper's representation to Braver that the delivery was "tough" suggests that the injury was a natural result of delivery complications, rather than a consequence of Dr. Tepper's own actions during delivery.[17] The government emphasizes the seriousness of R.B.'s condition, as if that were enough to raise alarm bells in Braver's mind that Dr. Tepper was somehow responsible. But the severity of R.B.'s injury is another "critical fact" going to the injury itself, rather than to its causation. *A.Q.C.*, 656 F.3d at 143 ("Not every conversation related to the nature of an injury, or the possibility of a plausible claim of medical malpractice related to that injury, will trigger the accrual date. The key, again, is identifying the time by which the plaintiff is 'told of or had reason to suspect' that 'the injury suffered related in some way to the medical treatment . . . received.'") (quoting *Valdez*, 518 F.3d at 177, 180).

The government relies heavily on the Second Circuit's opinion in *A.Q.C.* in support of its position. *A.Q.C.* was an FTCA action brought by an infant-plaintiff who suffered a brachial plexus injury during her birth in February 2005. *A.Q.C.*, 656 F.3d at 140. In that case, the government submitted that plaintiff's mother had reason to suspect that A.Q.C.'s injury was iatrogenic in December 2005, when an early intervention counselor "raised the possibility of medical malpractice and encouraged her to seek legal advice."[18] *Id*. Plaintiff asserted that her mother "could not have suspected that the injury was iatrogenic until she retained counsel, which

---

[17] Plaintiffs cite evidence that Dr. Tepper informed Braver following delivery that he "had to act quick" and perform "all these types of maneuvers" in delivering R.B. due to the shoulder dystocia. Golomb Decl., Ex. F, at 136-37 (Braver Dep.). This evidence is somewhat more suggestive that Dr. Tepper's actions during delivery may have caused or contributed to R.B.'s injury. However, I conclude that it remains too vague to have reasonably raised a suspicion in Braver's mind that the harm to R.B. was iatrogenic.

[18] The government's reliance on *A.Q.C.* is baffling given the argument it presented in that case that accrual was not shortly after A.Q.C.'s birth, when the "critical facts" of her injury were readily discernible, but months later, when the counselor raised the possibility of medical malpractice.

12

then received and reviewed the relevant medical records." *Id.* The Second Circuit rejected plaintiff's position that a court should "mechanically set[ ]the date of accrual to coincide with the retention of counsel, the receipt of medical records, or any other event in the litigation process." *Id.* at 142. It stated

> There is a strong argument that [plaintiff's mother's] December 2005 conversation with the early intervention counselor provided [her] with the requisite reason to suspect that A.Q.C.'s injury was "related in some way to the medical treatment" that she received. By then, [plaintiff's mother] knew that her daughter was injured at or around the time of her birth. She had also consulted with an early intervention counselor whose job it was to ensure that A.Q.C. received the care that her injury required. After sharing some of A.Q.C.'s medical records with that counselor, [plaintiff's mother] was informed that A.Q.C.'s injury may have resulted from medical malpractice. At that point, [plaintiff's mother] had at least some reason to suspect that A.Q.C.'s injury was related in some way to the treatment that she had received.[19]

*Id.* at 142.

*A.Q.C.* supports a decision in favor of plaintiffs here. As in *A.Q.C.*, Braver was aware of the "critical facts" of R.B.'s injury shortly after R.B.'s birth. And as in *A.Q.C.*, it was not until Braver had a conversation with someone who "informed [her] that [R.B.]'s injury may have resulted from medical malpractice" that she "had at least some reason to suspect that [R.B.]'s injury was related in some way to the treatment that she had received." *Id.* at 142. Accordingly, plaintiffs' claims accrued in October 2007, when Braver was informed that R.B.'s

---

[19] The Second Circuit did not hold that the December 2005 conversation with the early intervention counselor was the date of accrual of A.Q.C.'s claim because it found that "[t]he record contains few details of [plaintiff's mother]'s conversation with the counselor." *A.Q.C.*, 656 F.3d at 143. It noted: "Without a more complete account of the conversation, we are reluctant to conclude definitively . . . that the conversation itself was sufficient to put [plaintiff's mother] on notice that she should take action to protect her rights." *Id.* This hesitation further counsels that I should reject the government's position, as none of the information provided to Braver immediately following R.B.'s birth even approaches the tenor of the conversation A.Q.C.'s mother had with the early intervention counselor.

13

injury might have been caused by the delivering obstetrician, and the filing of the underlying action on August 25, 2009 was timely.

## CONCLUSION

For the foregoing reasons, the government's motion to dismiss the complaint is denied. Braver may file her proposed motion for partial summary judgment on or before May 31, 2013. The government may file papers in opposition on or before June 21, 2013. Braver may file reply papers on or before June 28, 2013. Oral argument on the motion for partial summary judgment will be held on July 12, 2013 at 10:30 AM.

So ordered.

John Gleeson, U.S.D.J.

Dated: May 10, 2013
       Brooklyn, New York